**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-0911 |
| v. | ) | |
| | ) | Hon. Franklin U. Valderrama |
| SHERWIN MILES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Mason (Plaintiff), an individual formerly in the custody of the Illinois Department of Corrections, brought this *pro se* civil rights lawsuit pursuant to 42 U.S.C. § 1983 alleging that he was subjected to various unconstitutional conditions of confinement while confined at Stateville Correctional Center's Northern Reception and Classification Center ("Stateville NRC") on court writs. Defendants Sherwin Miles (Miles), Darrin Hunter (Hunter), Berneita Barnes (Barnes), Nicholas Lamb (Lamb), and Nadine Lockett (Lockett) (collectively, Defendants) are employees of Stateville Correction Center or Stateville NRC. Defendants have moved for summary judgment, arguing: (1) the conditions described are not objectively serious enough to rise to the level of a constitutional violation; (2) Plaintiff has not brought forth evidence that Defendants were deliberately indifferent to those conditions; and (3) Plaintiff is barred from seeking compensatory damages because he did not suffer a physical injury.

For the reasons that follow, the motion is granted in part and denied in part. Plaintiff may proceed against Defendants Miles and Hunter in regard to his claims of unsanitary bedding. Plaintiff may proceed against Defendants Miles, Hunter, and Barnes in regard to his claims of a generally inadequate diet. He also may proceed against Defendant Barnes in regard to his claim that he did not receive his prescribed low-sodium diet. The Court reserves ruling as to the availability of compensatory damages. Summary judgment is granted for Defendants as to all other claims.

## Background

Plaintiff is proceeding against Defendants in their individual capacities on the following claims regarding his stays at Stateville NRC in 2018 and 2019 and as identified in Judge Feinerman's August 16, 2021, screening order: (1) unsanitary bedding at the facility, which Plaintiff alleged was a pervasive issue of which Defendants Miles, Barnes, Lamb, and Hunter were aware; (2) cells at the prison were nearly constantly illuminated, which Plaintiff alleged was a systemic issue of which Defendants Miles, Barnes, Lamb, and Hunter were aware; (3) the NRC showers were filthy and "infested" with gnats and flies, and Defendants Miles, Barnes, Lamb, and Hunter did not address Plaintiff's complaints about the conditions; (4) the food served at the prison lacked adequate nutritional value and Defendants Miles, Barnes, Lamb, and Hunter knew this but failed to rectify the situation; and (5) Defendants Barnes and Lockett failed to provide Plaintiff with a medically prescribed low-sodium diet.

## I.    Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted.) Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Defendants filed their Motion for Summary Judgment (R. 104), along with their Memorandum in Support of Summary Judgment (R. 106), and Local Rule 56.1

Statement of Facts with Exhibits. (R. 105). Because Plaintiff is proceeding *pro se*, Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (R. 112). Plaintiff responded by filing a response to Defendants' Statement of Facts (R. 118), what he has titled a "Statement of Additional Facts", but which consists of his own affidavit and other exhibits (R. 119), and a memorandum opposing the motion (R. 120).

Where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *Lamz*, 321 F.3d at 683 (7th Cir. 2003). Notwithstanding any admissions, however, the Court has interpreted Plaintiff's responsive filings generously, consistent with his *pro se* status, and will consider his recitation of facts to the extent that he has either pointed to evidence in the record or could properly testify himself about the matters asserted. *See James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(4)); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

The Court also is mindful that failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving parties. *Raymond v. Ameritech Corp.*, 442

4

F.3d 600, 608 (7th Cir. 2006) (moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law).

The Court will apply these standards in evaluating the evidence.

## II.    Relevant Facts[1]

Plaintiff was housed at Stateville NRC at all times relevant to this action.[2] DSOF at ¶ 1. Defendants held the following positions at the relevant times. Lamb was the Assistant Warden of Operations at Stateville Correctional Center. *Id.* at ¶ 2. Hunter was the Superintendent of Stateville NRC. *Id.* at ¶ 3. Barnes was the Assistant Warden of Programs at Stateville NRC. *Id.* at ¶ 4. Lockett was the Correctional Food Service Supervisor at Stateville NRC. *Id.* at ¶ 5. Miles was the Acting Warden of Stateville from Jan. 1, 2019, through July 31, 2019, and also served at the Assistant Warden of Operations at Stateville NRC from 2016 to June 16, 2020. *Id.* at ¶ 6.

The events at issue in this lawsuit occurred between 2018 and 2019 while Plaintiff was housed at Stateville NRC. DSOF ¶ 1.[3] During this time, Stateville NRC was not Plaintiff's parent facility. *Id.* at ¶ 2. Plaintiff went to Stateville NRC if he had

---

[1]Subject-matter jurisdiction is proper in this Court under 28 U.S.C. § 1331 and § 1343(a)(3), and venue is correct under 28 U.S.C. § 1391(b)(2) because the events occurred at Stateville NRC in Crest Hill, Illinois, which lies within this district. *See* R. 105, Defs.' Statement of Facts ("DSOF"), at ¶¶ 7-8.

[2]Per the IDOC web site, Stateville NRC is an intake and processing unit for the entire state. *See* https://idoc.illinois.gov/facilities/allfacilities/facility.stateville-correctional-center.html (last visited Feb. 13, 2023).

[3]Defendants set forth preliminary facts regarding the parties, venue, and jurisdiction, and then set forth a separately numbered list of "Undisputed Material Facts."

a court writ, and then would return to his home facility, which was Danville Correctional Center. *Id.*

The first time Plaintiff was housed at Stateville NRC was from October 2018 to December 2018 in Housing Unit E. *See* R. 118, Pl.'s Resp. to DSOF at ¶ 3; R. 105-1, Pl.'s Dep., at 19:13-17. The second time Plaintiff was at Stateville NRC was from January 2019 to February 2019 in Housing Unit F. *Id.* The third time Plaintiff was at Stateville NRC was from June 2019 to July 2019 in Housing Unit E. *Id.* The fourth time Plaintiff was housed at Stateville NRC was from November 2019 to December 2019 in Housing Unit E. *Id.*

Plaintiff first complains of unsanitary bedding at the facility. Plaintiff contends that the mattresses at the facility were "worn down, filthy[,] and emitted a foul odor." Pl.'s Resp. to DSOF at ¶ 4. Plaintiff was given a sheet, which could be placed over the mattress. DSOF at ¶ 4. Inmates also were given a bedroll, which Defendants describe as containing "washed sheets and blankets." *Id.* at ¶ 6. Plaintiff states that he received one blanket and one sheet, both of which were "in deplorable condition[]" when issued. Pl.'s Resp. to DSOF at ¶ 6.

According to former Superintendent Hunter, the mattress had plastic coverings, which were wiped down with bleach before being issued to inmates. DSOF at ¶ 4. Plaintiff contends that not all the mattresses had such coverings, and that he did not see them being wiped down with bleach. Pl.'s Resp. to DSOF at ¶ 4.

Stateville provided a laundry service through which inmates could wash their clothes, sheets, and blankets five days a week. DSOF at ¶¶ 5-6. Plaintiff contends the

laundry service was "not reliable," was not provided five days a week, and that inmates could not send blankets to be washed, although it is unclear why he believes this. Pl.'s Resp. to DSOF at ¶ 6; *see also* Pl.'s Dep. at 35:17-20 (Plaintiff testified without elaboration that he was not allowed to wash his blanket through the laundry service because it was wool). Plaintiff washed his clothes and sheet in his cell with his body soap. DSOF at ¶ 7; *see* Pl.'s Dep. at 36:6-9.

On Feb. 18, 2019, Plaintiff sought medical treatment after developing a rash on his neck that he believed was due to the sheet on his bed. Pl.'s Dep. at 37:6-38:20. Plaintiff described the rash as "a little circle with bumps" that were dry and itchy. *Id.* at 40:3-14. A nurse observed that the rash appeared to have faded and prescribed hydrocortisone cream. DSOF at ¶¶ 8-9. The rash did not return after Plaintiff used the hydrocortisone cream. *Id.* at ¶ 9. The nurse did not diagnose the rash as having been caused by the bedding, and Plaintiff does not have medical training to make such a diagnosis. *Id.* Plaintiff feared that he would develop "scabies" or other infections as a result of the bedding, but he did not suffer any other injuries that he believed to be caused by the bedding at Stateville NRC. *Id.* at ¶ 10; *see* Pl.'s Dep. at 42:19-44:3.

Plaintiff next complained of showers that were unsanitary due to mold and dirt on the walls, an infestation of flies and gnats, and backed-up water that he described as "sewage water." Pl.'s Dep. at 45:12-18; 47:7-18. Plaintiff was not injured as a result of the gnats or the backed-up water. DSOF at ¶¶ 11-12.

Former Superintendent Hunter stated that the showers at NRC would back up because the originally installed plumbing was not the appropriate size. *Id.* at ¶ 19; *see* R. 105-3, Hunter Decl. ¶ 4. Because of this, sometimes the water pressure is not sufficient for the water to push through the drain. *Id.* When this happens, the showers are shut down and prison staff uses a power washer to push the water down and clear the drain. *Id.* Superintendent Hunter stated that inmates were not allowed to shower until the drain was cleared. *Id.* He did not smell "sewage water" in the showers, nor had he heard complaints of that issue. *Id.* Superintendent Hunter further stated that he had not seen any flies in the showers, nor had heard complaints of that. *Id.* Plaintiff contends the showers at Stateville NRC were "constantly . . . backed up," excessively dirty, smelled, and had gnats. Pl.'s Resp. to DSOF at ¶ 19. Plaintiff was required to take a shower under those conditions or not shower at all. *Id.*

No one confirmed to Plaintiff that what he suspected to be mold in the shower was actually mold, and he did not touch it. *Id.* at ¶¶ 13-15. But Plaintiff contends that he worked as a "prison porter" for years, cleaned showers, and is familiar with what mold looks like. *Id.* at ¶ 14. Plaintiff acknowledges that he did not touch the mold, but he contends, without pointing to evidence in the record other than his own affidavit, that it caused "upper respiratory infections." *Id.* at ¶ 15.

Plaintiff's next issue with his conditions of confinement was that he contends the lights in his cell were left on for "extremely long periods of time" on numerous occasions and this interfered with his sleep "at times." Pl.'s Dep. at 54:24-55:17; 57:11-

14. Plaintiff does not know the names of the officers who left the lights on in his cell. DSOF at ¶ 16. Relying on Superintendent Hunter's declaration, Defendants state that lights inside the cell at Stateville NRC were turned off during the 11 p.m. to 7 a.m. shift. *Id.* at ¶ 17. They would be turned on during cell counts so that the officer could see the individual in the cell for safety reasons. *Id.* Plaintiff disputes this because he contends that the lights were left on for "unreasonable extended periods of time" after the counts were concluded. Pl.'s Resp. to DSOF at ¶ 17. Plaintiff never requested to see a doctor about the effect the lights were having on him, but he contends that sleep deprivation from the lights remaining on caused him psychological harm. DSOF at ¶ 18; Pl.'s Resp. to DSOF at ¶ 18.

Finally, Plaintiff complained about the diet at Stateville NRC, in regard to the calorie content, undercooked meat or green lunchmeat, and the alleged non-receipt of his low-sodium diet tray that was prescribed by a doctor at Danville Correctional Center. *See* Pl.'s Dep. at 59:18-60:1; 64:6-13; 65:12-17; 71:7-73:15. Plaintiff never worked in a prison kitchen or a kitchen outside IDOC. DSOF at ¶ 20. Plaintiff received three meals a day—breakfast, lunch, and dinner. *Id.* at ¶ 21. Plaintiff also received snacks, such as two small cookies or applesauce, although he contends that the snacks were not always provided and were sometimes stale and inedible. *Id.* at ¶ 22; *see* Pl.'s Resp. to DSOF at ¶ 22. No one told Plaintiff how many calories he was consuming at Stateville NRC. *Id.* at ¶ 23. Plaintiff contends that the meals were "under portion" compared to meals served to him in his parent facility. *Id.*

9

Although Defendants contend that Plaintiff did not speak to Defendant Barnes about not receiving his low-sodium diet tray, this does not comport with his testimony that he informed Barnes on one occasion upon arrival at the facility that he was on a low-sodium diet and had not been receiving his trays. DSOF at ¶ 25; *see* Pl.'s Dep. at 67:9-22. Plaintiff contends that Defendant Barnes told him she would check into it, but he never received his diet trays. Pl.'s Resp. to DSOF at ¶ 25.

Plaintiff did not speak to Defendant Lockett about the issue with his low-sodium diet. DSOF at ¶ 26. Plaintiff never sought medical treatment related to his complaint about undercooked meat. *Id.* at ¶ 27. Plaintiff did not eat the alleged green or pink bologna and did not get sick from it. *Id.* at ¶ 28.

Relying on the declaration of Lockett, the Food Service Supervisor at Stateville NRC from 2000 through Dec. 1, 2020, Defendants assert that meals provided to inmates were "wholesome and nutritious" and that each meal met the minimum recommended dietary allowances in accordance with state regulations. *Id.* at ¶ 29. Lockett further asserted that all meet was cooked properly at appropriate temperatures, with meat thermometers used to check the temperatures. *Id.* at ¶ 30. For example, chicken was cooked to 350 degrees in the oven and checked with thermometers. *Id.* Plaintiff disputes these facts, contending that he received "inedible nutritionally deficient meals daily" and that he was served undercooked chicken on "various occasions" that was inedible. Pl.'s Resp. to DSOF at ¶¶ 29-30.

The bologna was lunchmeat received form a vendor and was not cooked by the prison's dietary unit. DSOF at ¶ 31. Lockett did not recall seeing any pink or green

bologna, while Plaintiff contends that he was served discolored "green spotted" bologna. *Id.*; *see* Pl.'s Resp. to DSOF at ¶ 31. Plaintiff never saw a doctor about his alleged headaches or weight loss, although Plaintiff contends that he knew his weight loss was caused by not eating the "nutritionally deficient" meals at Stateville NRC. *Id.* at ¶ 32; *see* Pl.'s Resp. DSOF at ¶ 32.

After Plaintiff was put on medication for high-blood pressure, his levels started to go down. DSOF at ¶ 33.[4] Defendant Lockett stated in regard to special diet trays that she would receive an order from the Healthcare Unit informing her that an individual needed a special diet tray. *Id.* at ¶ 60. The Dietary Unit would then prepare the tray and give it to a correctional officer for delivery to the inmate. *Id.* After the tray was prepared, the Dietary Unit did not have any control over the tray or communication with the inmate. *Id.*

Lockett stated that her understanding of a low-sodium diet meant preparing the meals without salt, and that while preparing meals at Stateville NRC, the Dietary Unit did not utilize salt in any of the meals. *Id.* at ¶ 61.

Plaintiff's sodium levels were within the normal range according to medical records submitted by Defendants on six separate dates between April 6, 2018, and Sept. 23, 2019, apparently while Plaintiff was housed at Danville Correctional Center. *Id.* at ¶ 59; *see* R. 105-9, Plaintiff's Medical File. Defendants assert on this

---

[4]Plaintiff does not dispute this fact, but the Court observes that based on the cited testimony, it is unclear whether or when Plaintiff was prescribed medication for high blood pressure. Defense counsel asked: "After they checked your blood pressure for a week, what—did they give you any medication or did it go down? Plaintiff replied: Yeah, I guess it started going down or something cause they took me off from calling me over to get it checked." *See* Pl.'s Dep. at 77:4-9.

basis that Plaintiff suffered no injury. *Id.* Plaintiff disputes this, pointing to the fact that he received daily blood pressure checks for about a week in January 2019 while housed at Stateville NRC. Pl.'s Resp. to DSOF at ¶ 59, *see* R. 119, at pg. 90. The reason for these blood-pressure checks is unclear, but the medical records indicate that Plaintiff had undiagnosed hypertension and was not on medication as of that time. R. 119 at pg. 90.

Defendants assert that Plaintiff does not know whether he lost weight during the relevant time period (*see* DSOF at ¶ 34), but this does not accurately reflect Plaintiff's deposition testimony. Plaintiff testified that before he went to Stateville NRC in October 2018, he weighed close to 190 pounds, and upon his return to Danville Correctional Center in December 2018, he weighed "160, 170, something like that." Pl.'s Dep. at 80:9-15. He testified that by January 2019, he had "gained my weight back", but that he again lost weight after returning to Stateville NRC in February 2019, although he did not know how much. *Id.* at 80:16-81:2. Plaintiff did not remember how much he weighed in June or July of 2019 during his third trip to Stateville NRC. *Id.* at 81:5-9. He testified that he weighed about 180 pounds in November 2019, prior to his fourth trip to Stateville NRC, and "170 something" afterward. *Id.* at 81:10-18. His testimony on this point was somewhat equivocal, as he then stated that he was "actually not sure about the weight because I'm not seeing it within my medical file, personally." *Id.* at 81:19-20. It is unclear if he was referring to his final trip to Stateville NRC or his weight loss in general, but the affidavit he submitted in response to the motion for summary judgment states that Plaintiff lost

15 pounds from October to November 2018, during his first stay at Stateville NRC, and "excessive weight" on several other occasions while residing at the facility. *See* R. 119, Pl.'s Aff., pgs. 4-5, at ¶ 33.

Plaintiff does not anticipate that he will return to Stateville NRC. DSOF at ¶ 35.

Plaintiff did not hand Defendants his grievances about these issues. DSOF at ¶ 24. Plaintiff acknowledges that Defendant Miles was not aware that Plaintiff was not receiving his low-sodium diet tray. *Id.* at ¶ 37. He did not talk to or write to Defendant Miles about the conditions at issue in this lawsuit. *Id.* at ¶¶ 38-39. Plaintiff believes that Defendant Miles was aware of the other issues through the grievance process. *Id.* at ¶ 40. Plaintiff contends that he did not sue Defendant Miles because of her position as warden, but because she was "deliberately indifferent to the longstanding inhumane systemic deficiencies" at the prison and failed to remedy those conditions. *Id.* at ¶ 36; *see* Pl.'s Resp. to DSOF at ¶ 36.

Plaintiff never talked to or wrote Defendant Hunter about the issues in this lawsuit. DSOF at ¶¶ 41-42. Plaintiff believes that Defendant Hunter was aware of these issues through the grievance process, although he acknowledges that Hunter did not know about Plaintiff not having received his low-sodium diet tray. *Id.* at ¶ 43-44.

Plaintiff sued Defendant Lamb because his position as Assistant Warden at Stateville Correctional Center. *Id.* at ¶ 45. However, Defendant Lamb was not Assistant Warden of Operations at Stateville NRC, and did not have authority or

13

control over issues at the NRC during the relevant time period. *Id.* Plaintiff never talked to or wrote Defendant Lamb about these issues and Defendant Lamb was not aware of Plaintiff having not received his low-sodium diet tray. *Id.* at ¶¶ 46-48.

In regard to Defendant Barnes, Plaintiff disputes that he sued her because of her position as an assistant warden, contending that she was "deliberately indifferent to the longstanding inhumane systemic deficiencies and failed to remedy those conditions." *Id.* at ¶ 49; *see* Pl.'s Resp. to DSOF at ¶ 49. Plaintiff believes that Defendant Barnes was aware of these issues through the grievance process. DSOF at ¶ 50. He did not write to her about these issues, although he contends that he spoke with her about his low-sodium diet tray and the condition of the showers. *Id.* at ¶ 51; *see* Pl.'s Resp. to DSOF at ¶ 51; *see also* Pl.'s Dep. at 69:5-12.

Plaintiff did not speak to Defendant Lockett about his issues with the low-sodium diet tray, but he contends that he wrote to the "dietary supervisor" two to three times about these issues, although he did not keep a copy of those letters. DSOF at ¶ 53; *see* Pl.'s Resp. to DSOF at ¶ 53; Pl.'s Dep. at 90:9-18. These letters did not have Lockett's name on them. Pl.'s Dep. at 90:11-14.

The parties dispute the number of grievances Plaintiff submitted regarding the issues in this case. Defendants point to Plaintiff's February 2, 2019 and December 6, 2018, grievances. DSOF at ¶ 54.; *see* R.105-8, Plaintiff's Grievances dated 12/06/2018 and 02/02/2019. Neither of the grievances named any Defendants, and the February 2, 2019, grievance concerned conditions at Stateville NRC that are not the subject of this lawsuit. DSOF at ¶¶ 54, 58. Plaintiff asserts that he also submitted a grievance

dated December 13, 2019, relevant to the issues in this case, which in part concerned having not received his low-sodium diet. *See* Pl.'s Resp. to DSOF at ¶ 54; *see* R. 119 at pg. 78. It is unclear if any Defendants were named in this third grievance.

Defendants assert that the December 6, 2018, grievance (to which they incorrectly refer to as being dated December 16, 2018) did not mention Plaintiff's complaints concerning his mattress, the conditions in the shower, or the low-sodium diet tray. DSOF at ¶¶ 55-56. The grievance did state that the sheet was filthy, however. *Id.* at ¶ 55.

Defendant Hunter responded to the Administrative Review Board and provided information in regard to the December 6, 2018, grievance. DSOF ¶ 55. Specifically, he stated that inmates are issued one clean sheet and blanket, and that the bedroll is made up daily from the laundry when it is washed and dried. *Id.* at ¶ 57. Defendant Hunter further asserted that he personally eats the food at Stateville NRC that is prepared in the same kitchen as the food for inmates. *Id.* Finally, Defendant Hunter stated that the cell lights were operational and working appropriately. *Id.* Plaintiff disputes this, contending that NRC staff are not served the same food as inmates, and that Defendants were aware of "longstanding inhumane systemic living deficiencies." Pl.'s Resp. to DSOF at ¶ 57.

## Discussion

### I. Summary Judgment Standard

On summary judgment, the Court must view the record in the light most favorable to the non-moving party and grant the motion if "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021); Fed. R. Civ. P. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element that is essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties seeking summary judgment bear the initial burden of showing the grounds for their motion. *Id.* at 323. Once they have done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id.*

The Court must construe all facts in the light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.*

## II.    Legal Standard

The Eighth Amendment, in prohibiting cruel and unusual punishment, does not mandate comfortable prisons, but it does require humane ones. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). Specifically, the Eighth Amendment requires correctional officials to provide inmates with "adequate food, clothing,

shelter, and medical care." *Id.* at 719 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prisoners also must receive "'reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities.'" *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (quoting *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016)).

A conditions of confinement claim under the Eighth Amendment has two elements. First, the deprivation must be "sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities." *Gray*, 826 F.3d at 1005 (cleaned up). Conditions of confinement that do not by themselves violate the Eighth Amendment may do so in combination if "the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) (citing *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)).

The length of time an inmate is exposed to the harm also may affect whether the condition violates the Eighth Amendment. *Myers v. Ind. Dep't of Correction*, 655 F. App'x. 500, 504 (7th Cir. 2016) (unpublished) (citing *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978)). In this regard, "a condition which might not ordinarily violate the Eighth Amendment may do so if it persists over an extended period of time." *See Dixon v. Godinez,* 114 F.3d 640, 643 (7th Cir. 1997); *see also Thomas v. Illinois*, 697 F.3d 612, 614–15 (7th Cir. 2012) (in considering severity of conditions of confinement, courts must consider the conditions' nature, duration, and any risks of harm).

The second, subjective, prong requires that prison officials must be "deliberately indifferent to this state of affairs." *Gray*, 826 F.3d at 1005. This

generally means that the prison official knew of, and consciously disregarded, a substantial risk of harm. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022). However, a jury may infer that senior prison officials are aware of systemic, as opposed to localized, conditions of confinement. *Gray*, 826 F.3d at 1008–09.

## III.  Analysis

As a preliminary point, the Court finds that Defendant Lamb is entitled to judgment as a matter of law. The undisputed evidence is that Lamb was the Assistant Warden of Operations at Stateville Correctional Center during the relevant time period, was not in charge of operations at Stateville NRC, and did not have authority or control over issues related to Stateville NRC during the relevant time period. DSOF ¶ 45. Nor is there any evidence that the alleged constitutional violations occurred at Defendant Lamb's direction or with his knowledge and consent. Because liability under § 1983 is premised upon personal responsibility, a defendant cannot be held liable unless he caused or participated in the alleged constitutional deprivation. *See Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012). Because the undisputed evidence is that Lamb did not participate in the any of the alleged constitutional violations, judgment will be entered in his favor.

### A.  Condition of Mattress and Bedding

Defendants argue that the conditions to which Plaintiff was exposed were not objectively serious enough to invoke Constitutional protections. R. 106, Memo. Summ. J. at 4-10. The Court observes that the record is rife with disagreements as to the nature and severity of these conditions, but at this stage of the case, the Court

18

must accept Plaintiff's description of those conditions and view the record in the light most favorable to him. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

First, as to Plaintiff's claim of unsanitary bedding, Plaintiff contends that he received filthy mattresses that smelled foul (he described an odor of urine), and that he received a sheet and a blanket that were sometimes ripped and were in poor condition. Pl's Dep. at 25:16-27:1. Not all of the mattresses had covers. Pl.'s Resp. DSOF ¶ 4. Plaintiff further contends that the laundry service at the prison was not reliable, although he was able to clean the sheet with soap in his cell. *Id.* ¶ 6. He contends he was unable to clean the blanket because it was wool, although it is unclear why he believes this. Pl's Dep. at 25:16-27:1.

A lack of clean bedding may be sufficiently serious to invoke the Eighth Amendment. *Townsend v. Fuchs*, 522 F.3d 765, 768, 774 (7th Cir. 2008) (prisoner who spent 59 days sleeping on a "wet and foul" mattress adequately described a potential violation of his Eighth Amendment rights). While bedding that is uncomfortable or merely used by other inmates does not violate the Constitution, bedding that is foul-smelling or contaminated with body fluids may. *Boyce v. Johnson*, 2015 WL 7351679, at *11 (N.D. Ill. Nov. 20, 2015) (collecting cases). The presence or absence of other unsanitary conditions in the cell and the availability of cleaning supplies also weighs in this analysis. *Id.*

Although a close question, the Court finds that Plaintiff has presented sufficient evidence that the condition of the mattresses was objectively serious enough to violate the Constitution. Plaintiff describes the mattresses as smelling of

19

urine, and exposure to human waste may violate the Eighth Amendment. *See Lindell v. Pollard*, 558 F. Supp. 3d 734, 751–52 (E.D. Wis. 2021) (collecting cases). True, Plaintiff's exposure is not as severe as described in some cases. *See e.g., Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (prisoner claimed he was confined in a cell covered "nearly floor to ceiling in feces" and then transferred to another, frigidly cold cell with raw sewage spilled across the floor); *Thomas*, 2 F.4th at 720–21 (inmate confined in cell with feces-covered walls, a lack of hot water, hundreds of dead flies in his bed, and a mattress covered in human waste); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prisoner alleged that cell was filthy and smelled of human waste, lacked adequate heating, contained dirty bedding, and had "rusted out" toilets, no toilet paper, and black worms in the drinking water). However, Plaintiff was required to use the dirty, foul-smelling mattresses to sleep, and there is a question of fact as to whether he could use the sheet to mitigate his contact with the mattress, given that he describes the sheets as torn and so filthy they were brown instead of white. Plaintiff further testified that the sheets were still "filthy" even after he hand-washed them in his cell. Pl.'s Dep. at 32:20-23; 43:5-9.

Defendants contend that liability under § 1983 typically requires direct, personal involvement, which Plaintiff has not established. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *see also Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) (rejecting the premise that any public official who knows about a wrong must do something to fix it); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996) (supervisory officials cannot be held liable based on *respondeat superior*; they must

have actually participated in the constitutional violation). Defendants also contend that Plaintiff has not brought forth evidence that the conditions at issue were systemic, such that the involvement of high-level officials could be inferred. *See* R. 134, Defs.' Reply in Supp. of Mot. for Summ. J., at 14-15.

A systemic violation is one that affects a widespread group of inmates. *Eason v. Pritzker*, 2020 WL 6781794, at *5 (N.D. Ill. Nov. 18, 2020). Typical examples include vermin infestations, inadequate recreation or nutrition, extreme temperatures, and contaminated water. *Id.* (collecting cases). Inadequate bedding for a sustained duration can also be a systemic condition. *See Antonelli*, 81 F.3d at 1426, 1429.

Plaintiff describes the issue with unsanitary bedding as a pervasive one due to the constant cycling of prisoners through Stateville NRC, not one that was not limited to his particular cell. Pl.'s Dep. at 26:17-27:19. Plaintiff may proceed with this claim against Defendants Miles and Hunter because these supervisory officials can realistically be expected to know about, or participate in creating these systemic conditions. The Court observes that Barnes, in her declaration, states that as Assistant Warden of Programs, she oversaw the Healthcare and Mental Health Units. She states that she had no authority over the condition of the showers, mattresses, or other bedding. *See* R. 105-4, Barnes Decl. at ¶ 2. She does not address her authority, or lack thereof, over prisoners' diets. Because Plaintiff has not brought forth any contrary evidence indicating that Defendant Barnes had any authority over

21

the condition of prisoners' bedding, she will be granted summary judgment as to this claim.

### B.    Constant Illumination

Plaintiff contends that it was a routine practice at Stateville NRC for officers to purposely leave the lights on for an extended period of time, so the Court will consider this to be a potentially systemic condition. R. 120, Resp. Memo. J. at 5. Nonetheless, Plaintiff has not brought forth sufficient evidence of a constitutionally serious deprivation.

In considering a claim for sleep deprivation due to a constantly lighted cell, the court must consider the duration of the condition, the effects of the interruption on the inmate, as well as any legitimate reasons for the interruption. *Thomas v. Illinois*, 2012 WL 3263587, at *9 (S.D. Ill. Aug. 9, 2012) (citing *Scarver v. Litscher,* 434 F.3d 972, 974 (7th Cir. 2006)). In general, extreme deprivations are required to make out a claim. *See Vasquez v. Frank*, 290 F. App'x. 927, 929 (7th Cir. 2008) (unpublished) (24-hour lighting involving a single, 9-watt fluorescent bulb was not objectively serious deprivation); *King v. Frank*, 371 F. Supp. 2d 977, 985 (W.D. Wis. 2005) (defendants were entitled to summary judgment as to prisoner's claim of constant illumination where the evidence showed plaintiff could use a towel or clothing to cover his eyes while low-wattage bulb remained lit to allow prison officials to observe inmates at night); *Cf. Keenan v. Hall*, 83 F.3d 1083, 1090–91 (9th Cir. 1996) ("large florescent lights" that remained constantly on such that inmate could not tell day from night created issue of fact on Eighth Amendment claim)*; Shepherd v. Ault*, 982

F. Supp. 643, 648 (N.D. Iowa 1997) (prisoners who spent 283 and 550 nights, respectively, in solitary confinement with sixty-watt light bulbs that they could not cover presented sufficient evidence to go to trial).

Here, the evidence is that lights were turned off from 11 p.m. to 7 a.m., but would be turned on when an officer was conducting a cell check. Plaintiff disputes this, but only to the extent that he contends the lights were left on for an "unreasonable" amount of time after cell check. Plaintiff does not elaborate on what he means by an "unreasonable" amount of time. He also brought forth no evidence about how bright the lights were or whether anything prevented him from covering his eyes with a towel or clothing while he attempted to sleep. Plaintiff asserts that he "couldn't sleep at times" (*see* Pl.'s Dep., at 57:13-14), but does not attempt to quantify how much sleep he got or how often his sleep was disturbed.

At the summary judgment stage, it is incumbent on Plaintiff to bring forth "specific and concrete evidence about the nature and severity" of this alleged deprivation, and he has not done so in regard to his claim of constant illumination, so judgment in Defendants' favor is appropriate. *See Mitchell v. Dane Cnty. Sheriff Dep't*, 2018 WL 851391, at *7 (W.D. Wis. Feb. 13, 2018) (citing *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a lawsuit."); *see also Smith v. Godinez*, 2023 WL 358792, at *8 (N.D. Ill. Jan. 23, 2023) (observing that sleep-deprivation due to cell lighting is a "fact-specific inquiry," and finding that claim could not proceed based on facts that were "too thin to reasonably connote ***extreme*** sleep deprivation) (emphasis in original).

23

Given the deference to which prison officials are entitled on matters of security, *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) (en banc)), and given the undisputed evidence that the lights were turned on during inmate counts for security purposes, the Court cannot find sufficient evidence of an objectively serious deprivation based on the limited evidence brought forth by Plaintiff. Summary judgment will therefore be granted to Defendants as to this claim.

### C.    Unsanitary Showers

Plaintiff next complains of showers that were unsanitary due to mold and dirt on the walls, an infestation of flies and gnats, and backed-up water that he described as "sewage water." Pl.'s Dep. at 45:12-18; 47:7-18. Plaintiff was not injured by the gnats or the backed-up water. Mold and filth in communal showers is the type of condition that may be systemic and affect large groups of inmates. *See Bumpas v. Dart*, 2022 WL 2952778, at *2 (N.D. Ill. July 26, 2022) (collecting cases). However, even assuming that the condition described was systemic, Plaintiff has not brought forth evidence that the condition of the showers deprived him of the minimal civilized measure of life's necessities. Nor has Plaintiff brought forth facts suggesting that the condition of the showers combined with any other condition to deprive him of a single, identifiable human need. *See*, *e.g.*, *Godinez*, 2023 WL 358792, at *8 (N.D. Ill. Jan. 23, 2023) (observing that widespread infestations and a lack of cleaning supplies could, taken together, deny a prisoner of the human need of sanitation).

In regard to the mold and filth in the showers, allegations of long-term exposure to mold that causes breathing problems may be sufficient to support an

Eighth Amendment claim. *See, e.g., Board v. Farnham*, 394 F.3d 469, 486–87 and n.10 (7th Cir. 2005) (allowing prisoners to pursue their claim that their asthma was worsened by exposure to mold and other substances); *Shehadeh v. Cox*, 2011 WL 2837696, at *5 (S.D. Ill. July 14, 2011) ("Conditions such as poor ventilation do not fall below 'the minimal civilized measure of life's necessities,' absent medical or scientific proof that such conditions exposed a prisoner to diseases or respiratory problems which he would not otherwise have suffered." (collecting cases)). The mere presence of dirt or mold does not suggest a severe deprivation, however. *See, e.g., Striblin v. Buncich*, 2015 WL 4724899, at *7 (N.D. Ind. Aug. 7, 2015).

Similarly, while pest infestations may violate the Eighth Amendment, *see Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008), such conditions must be severe. *Cf. Godinez*, 2023 WL 358792, at *7 (plaintiff who described Stateville as a "pseudo-aviary" with birds nesting and leaving droppings everywhere, rampant rodents, and cockroaches that frequently crawled on him while he slept presented evidence of severe condition); *with Mitchell*, 2018 WL 851391, at *6 (W.D. Wis. Feb. 13, 2018) (presence of sewage flies without more information about severity of infestation or accompanying injuries did not suggest a serious deprivation).

The instant case is similar to *Allen v. Malone*, in which the prisoner plaintiff complained that the bathroom in his dorm did not drain properly during showers, was infested with small flying bugs, and was moldy, causing him dryness in his throat and tightness in his chest. 2009 WL 2595615, at *2 (E.D. Wis. Aug. 20, 2009). In finding that the plaintiff had not raised a question of fact on the objective prong, the

court observed that the plaintiff had not presented any evidence that his health problems resulted from his conditions of confinement. *Id.* at *3 (citing *Dixon*, 114 F.3d at 645 (unsupported allegation that "rank air" from inadequate ventilation exposed prisoner to respiratory problems did not survive summary judgment). The court in *Allen* further observed that minor respiratory problems generally are not sufficiently serious to support an Eighth Amendment claim. *Id.* at *3–4 (citing *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

The same considerations apply in this case. While Plaintiff states in his affidavit that fumes from the shower caused him upper respiratory infections, he points to no medical or scientific evidence supporting this assertion. Nor has he brought forth evidence indicating that the problems with back-up water and gnats in the shower were so severe or pervasive as to violate his Eighth Amendment rights. For these reasons, Defendants are granted summary judgment as to Plaintiff's unsanitary shower claims.

### D.    Dietary Claims

The Eighth Amendment requires prison officials to ensure that prisoners receive adequate nutrition. *Williams v. Shah*, 927 F.3d 476, 479–80 (7th Cir. 2019); *see also Jaros v. Illinois Dep't of Corrections*, 684 F.3d 667, 670 (7th Cir. 2012) (adequate food is among the minimal civilized measures of life's necessities); *Smith v. Dart*, 803 F.3d 304, 311–12 (7th Cir. 2015) (prisoner meals must be nutritionally adequate and "prepared and served under conditions which do not present an

immediate danger to the health and well-being of inmates who consume it." (citing *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir. 1985)).

To assess whether a deprivation of food is sufficiently serious, the Court must consider the amount and duration of the deprivation. *Shah*, 927 F.3d at 480 (citing *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999)). Additionally, interference with a prescribed medical diet can amount to deliberate indifference. *McDonald v. Hardy*, 821 F.3d 882, 890 (7th Cir. 2016); *see Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (withholding of food can be an objectively serious deprivation depending on the amount and duration of the deprivation, as well as the medical condition of the inmate).

Prisoners are not entitled to food that is tasty or even appetizing, and isolated incidents of spoiled or inedible food does not indicate a constitutional deprivation. *See*, *e.g.*, *McMullen v. Bedwell*, 2022 WL 3716531, at *4 (S.D. Ind. Aug. 29, 2022) (prisoner did not show objectively serious threat to his health or safety based on having twice received rotten eggs and once receiving a moldy orange, where he did not take issue with the overall adequacy the diabetic meals he received); *see also Jaros.*, 684 F.3d at 671 (occasional missed morning meals did not endanger inmate's health). But food that is "so unpalatable as to be inedible," or which repeatedly causes illness, cannot be thought of as providing adequate nutrition. *Smego v. Aramark Food Servs. Corp.*, 2013 WL 1987262, at *5 (C.D. Ill. May 13, 2013) ("If the meal cannot be eaten as a practical matter, then the meal cannot as a practical matter provide adequate nutrition."); *see also Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012)

27

(sickening food that caused substantial weight loss, vomiting, and stomach pains would violate the Eighth Amendment).

Plaintiff has not brought forth any evidence of the calorie-count of the food he was served, but he contends that the food was inedible on a daily basis, including undercooked meat that made him throw up a few times, green lunch meat that he did not eat, and milk that was foul and lumpy. Pl.'s Resp. to DSOF at ¶ 29; *see also* Pl.'s Dep. at 71:7-74:1. Plaintiff refused to eat the meat after it made him ill. Pl.'s Dep. at 72:11-19. Plaintiff asserts, in short, that the meals served at the prison were routinely inedible, and that he lost weight as a result. This is sufficient to create a question of fact as to whether the alleged deprivation of food was constitutionally significant. *See Davis v. Sheward*, 2021 WL 633108, at *4–5 (N.D. Ind. Feb. 17, 2021) (prisoner's testimony that he was regularly denied an adequate quantity of food for a prolonged period of time was sufficient to survive summary judgment).

The Court observes that in arguing that Plaintiff's dietary issues did not amount to an objectively serious deprivation, Defendants do not address the alleged denial of his low-sodium diet tray. *See* Memo. Summ. J. at 10-12. Later, in regard to the subjective prong, they contend that a "low sodium diet meant preparing the meal with no salt," and the Dietary Unit at Stateville NRC did not add salt to meals, so any meal that Plaintiff received would have been considered low in sodium. *Id.* at 15. This does not logically follow, as many packaged and prepared foods have a high sodium content without the addition of any salt. Defendants have not presented any evidence that the diet provided to Plaintiff comported with the low-sodium diet

prescribed by a treater at his parent facility or that his needs were otherwise accommodated, such as by teaching him how to select foods from the regular food tray to meet prescribed dietary needs. *See Wilder v. Aramark*, 2017 WL 4159382, at \*9 (N.D. Fla. Aug. 9, 2017), *report and recommendation adopted*, 2017 WL 4157535 (N.D. Fla. Sept. 19, 2017) (citing *Startz v. Cullen*, 468 F.2d 560, 561–62 (2d Cir. 1972)).

Additionally, to the extent that Defendants contend that Plaintiff suffered no harm because his sodium levels were normal in tests conducted at other times when Plaintiff was housed at Danville Correctional Center, or because medication lowered his blood pressure at some unspecified time, these arguments are underdeveloped and are waived. *Shipley v. Chi. Bd. of Election Comm'rs,* 947 F.3d 1056, 1062–63 (7th Cir. 2020) (arguments which are "underdeveloped, cursory and lack supporting authority" are waived); *see also McDonald*, 821 F.3d at 891–92 (rejecting argument that lack of low-cholesterol diet caused no harm without either expert opinion that lack of diet caused no harm or evidence that prisoner's cholesterol level remained steady after diet was taken away).

Plaintiff has brought forth sufficient evidence that the lack of adequate nutrition, and the denial of his low-sodium diet, amounted to an objectively serious harm. As stated above, an inadequate diet can be a systemic condition, as it affects large groups of inmates. Plaintiff may therefore proceed with his general dietary claim against Defendants Miles, Hunter and Barnes.[5]

---

[5]As noted above, while Defendant Barnes disavows having any authority over the conditions of the showers and bedding at the facility, her declaration does not specifically address

As to Plaintiff's claim regarding his low-sodium diet, this is an individualized issue. Plaintiff acknowledges that he did not discuss this issue with Defendants Miles, Hunter, or Lockett. He acknowledges that Defendants Miles and Hunter were not aware that he was not receiving his low-sodium diet tray, so they cannot be liable for this issue. Pl.'s Resp. DSOF ¶¶ 26, 37, 44, 46-48. As to Lockett, Plaintiff states that he wrote letters to the "dietary supervisor," but these letters did not name Lockett and there is no evidence in the record that she received them. Defendant Lockett cannot be held liable simply because of her position as a food service supervisor absent evidence that she was informed of the problem and failed to remedy it. *Lewis v. Eng.*, 2021 WL 5140635, at *1 (N.D. Ind. Nov. 4, 2021) (rejecting that kitchen director could be held liable solely because he oversaw kitchen staff preparing meals, but finding director was informed of the problem on several occasions and claim could proceed on that basis). The only Defendant that Plaintiff contends he informed about the failure to receive his low-sodium diet was Defendant Barnes. While Barnes does not recall speaking with Plaintiff (*see* Barnes Decl. at ¶ 3), whether Plaintiff reported this problem to her and whether she responded reasonably are questions of fact for the jury. This claim may proceed against Defendant Barnes only.

---

whether she had any authority over the Dietary Unit. The Court will therefore allow this claim to proceed against her at this time. As to Defendant Lockett, Plaintiff now argues that she was "well aware of the long-standing systemic nutritionally deficient meals served." *See* R. 120, Pl.'s Resp. to Mot. Summ. J. at 8. But Plaintiff brought a claim against her only for denial of his low-sodium diet tray. R. 58, Pl.'s Second Amended Compl., at 9. Plaintiff cannot raise new claims in opposition to the motion for summary judgment. *See, e.g., Stallings v. Best*, No. 16 C 11063, 2018 WL 4300488, at *4 (N.D. Ill. Sept. 10, 2018) (collecting cases), *aff'd,* 777 F. App'x 831 (7th Cir. 2019) (unpublished).

E.    **Absence of Physical Injury**

Defendants argue that because Plaintiff did not suffer physical injury, he is barred from seeking compensatory damages regarding the alleged constitutional violations. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ."). Defendants acknowledge that Plaintiff would be entitled to nominal or punitive damages for any claims that survive summary judgment. *Gray*, 826 F.3d 1007; *see Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) ("[P]hysical injury is merely a predicate for an award of damages for mental or emotional injury, not a filing prerequisite for the federal civil action itself."). Defendants also argue that any request for injunctive relief is moot, given that Plaintiff no longer resides at Stateville NRC and does not anticipate returning.

The Court agrees that any request for injunctive relief is moot, given Plaintiff's release from custody and his acknowledgement that he does not expect to return to Stateville NRC. *See Lehn v. Holmes*, 364 F.3d 862, 871–72 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot."); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (when prisoner is transferred to another prison, his request for injunctive relief is moot unless "he

can demonstrate that he is likely to be retransferred").[6] But any determination of the availability of the remainder of damages is premature.

As a preliminary point, it is questionable whether the availability of a certain type of damages is an appropriate subject for summary judgment, as the prayer for relief and type of damages sought are not part of the claim or defenses for which summary judgment may be sought. *See McFarthing v. Colone*, 2020 WL 3250740, at *10 (N.D. Ill. June 16, 2020) (citing *D.A. v. Meridian Joint Sch. Dist. No. 2*, 289 F.R.D. 614, 626–27 (D. Idaho 2013)). In any event, Defendants have not shown that they are entitled to judgment as a matter of law on the matter of the availability of compensatory damages.

This case is similar to *Santiago v. Rabideau*, in which the prisoner plaintiff alleged that he suffered, among other symptoms, headaches and weight loss due to the conditions at Stateville Correctional Center, including inedible food. 2019 WL 1747361, at *13–14 (N.D. Ill. Apr. 18, 2019). The court in *Santiago* observed that to the extent the plaintiff could substantiate his claim of weight loss, migraine headaches, and hunger pains, those injuries might be physical in nature and entitle the plaintiff to compensatory damages. *See id.* at *15 (citing *Walker v. Powell*, 2007 WL 4303766, at *9 (N.D. Fla. Dec. 10, 2007) (finding jury issue as to whether insufficient diet caused headaches and stomach pains)). Defendants do not address

---

[6]The Court observes that Judge Feinerman, who previously presided over this case, dismissed any claim for injunctive relief in his order screening the amended complaint, R. 18, and did not include such a claim in his list of claims that were proceeding from the second amended complaint, R. 57. By the time Plaintiff had filed his amended complaint, Plaintiff was no longer housed at Stateville NRC and did allege facts indicating that he was likely to be re-transferred to that facility.

this issue, instead stating that Plaintiff does not know whether he lost weight during the relevant time period, which does not accurately reflect the record. Because Defendants have not addressed all of Plaintiff's claimed harms, they are not entitled to judgment as a matter of law on this issue. Should the case proceed to trial, this issue may be appropriately addressed through a motion *in limine* prior to trial. In the meantime, the parties are encouraged to discuss settlement.

## Conclusion

Defendants' motion for summary judgment [104] is granted in part and denied in part. In sum, Plaintiff may proceed against Defendants Miles and Hunter in regard to his claims of unsanitary bedding. He may proceed against Defendants Miles, Hunter, and Barnes in regard to his claims of a generally inadequate diet. He also may proceed against Defendant Barnes in regard to his claim that he did not receive his prescribed low-sodium diet. The Court reserves ruling as to the availability of compensatory damages. Summary judgment is granted for Defendants as to all other claims.

DATE: March 24, 2023

Franklin U. Valderrama
United States District Judge